

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-8-2004

# Gibson v. Mayor Cncl

Precedential or Non-Precedential: Precedential

Docket No. 02-3952

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Gibson v. Mayor Cncl" (2004). *2004 Decisions.* Paper 1049.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1049

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 8, 2004

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3952

CHRISTOPHER GIBSON, *Appellant*

v.

MAYOR AND COUNCIL OF THE CITY OF WILMINGTON, a
municipal corporation, MICHAEL A. BOYKIN, RITA
CROWLEY, MARLYN DIETZ, and MICHAEL MAGGITTI, all
in their individual capacities, *Appellees*

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civ. No. 780-GMS)
District Judge: Honorable Gregory M. Sleet

Argued: September 8, 2003

Before: BARRY, BECKER, and GREENBERG
*Circuit Judges.*

(Filed January 8, 2004)

JAMES J. KNICELY, ESQUIRE
 (ARGUED)
Knicely & Associates, P.C.
487 McLaws Circle, Suite 2
Williamsburg, VA 23185

THOMAS S. NEUBERGER, ESQUIRE
Thomas S. Neuberger, P.A.
Two East Seventh Street, Suite 302
Wilmington, DE 19801

*Counsel for Appellant*

JAN A. T. VAN AMERONGEN JR.,
 ESQUIRE (ARGUED)
Jan A. T. van Amerongen, LLC
1225 King Street, Suite 301
Wilmington, DE 19801

*Counsel for Appellee*

## OPINION OF THE COURT

BECKER, *Circuit Judge*.

Plaintiff Christopher Gibson ("Gibson"), a ten year veteran of the Wilmington, Delaware Police Department ("WPD") who was discharged for making dishonest statements to his supervising officers, appeals the District Court's *sua sponte* grant of summary judgment on the grounds that the regulation pursuant to which he was discharged, WPD Directive 7.3D, the "Honesty Directive," was vague and overbroad. Directive 7.3D provides: "Members and employees are required to be truthful and forthright at all times. Violation of this regulation will result in disciplinary action as specified for a class 'A' violation, with the only applicable penalty being dismissal." While Gibson's vagueness and overbreadth challenges are facial, he contends, as required by overbreadth doctrine, that a substantial amount of speech protected under the First Amendment will be chilled under its aegis.

In addition to asserting this substantive claim, Gibson claims that the grant of summary judgment should be set aside because the District Court failed to give notice that summary judgment was being contemplated against him. Concomitantly, Gibson contends that the grant of summary judgment should be set aside because it prevented him from pursuing his chosen trial strategy. Gibson also argues that the District Court abused its discretion in reopening the record once jury deliberations had begun (1) by allowing the jury to hear audio tapes of conversations not introduced at trial that Gibson had had with his supervisor and with his brother Ed, a civilian employee of the WPD, which contained some of the false statements at issue; and

(2) by supplying the jury with dictionary definitions of the words "motivating" and "forthright" at its request. Gibson also contends that the District Court erred in ruling against him under Federal Rule of Evidence 405 (b) when it refused to allow him to admit into evidence documents offered to show that he was not dishonest.

We will affirm the judgment in all respects. In doing so we recognize an exception to the notice requirement of Rule 56 in those cases where summary judgment is granted *sua sponte* subject to the meeting of three conditions: (1) the point at issue is purely legal; (2) the record was fully developed, and (3) the failure to give notice does not prejudice the party, all of which are met here. We conclude that the District Court did not err: (1) in rejecting Gibson's vagueness and overbreadth challenges; (2) in its rulings to reopen the record to admit audio tape recordings and two dictionary definitions for the jury's consideration; and (3) in denying Gibson the right to introduce into evidence documents pertaining to Gibson's general job performance and good character.

## I.  Facts and Procedural History

Gibson joined the Wilmington Police Force on November 13, 1989. On July 15, 1999, he was scheduled to serve a one day suspension for a previous failure to follow the sick leave policy. In connection with that suspension, Gibson was required to surrender his departmental equipment for that one day; however, he did not turn in his equipment at the end of his previous shift (on July 14). On July 16, 1999, Gibson was scheduled to return to work at 6:00 a.m. On the morning of July 16, Gibson called off sick at 5:36 a.m. by placing a call to Sergeant Stevenson. When asked to give his location, he supplied the address as 1208 Pearl St., Wilmington. However, he was apparently calling from 401 Llangollen Blvd. in New Castle, a separate municipality some eight miles from Wilmington. Pursuant to the City of Wilmington Police Directive 7.1J, police officers are required to be residents of the City of Wilmington.

Directive 6.42 (A) (9) of the Wilmington Police Officer's Manual requires that an officer calling off sick:

shall not leave his location, unless authorized by the Police Physician or the officer's private physician. If the authorization is granted, and prior to leaving their reported location, it will be the responsibility of the officer to inform the House Sergeant of his leaving that reported location. The officer will also report the reason for leaving the location.

During the morning of July 16, Sergeant Greg Ciotti, Gibson's immediate supervisor, learned that Gibson had failed to turn in his equipment. At approximately 12:30 p.m., Ciotti went to 1208 Pearl St. to collect the equipment. No one answered the door, but Ciotti could see that someone was in the house. Ciotti called the WPD radio room to confirm the address. The radio dispatcher phoned Gibson at the call-off number he had provided that morning. Gibson answered the radio room's call but was not, in reality, at the Pearl St. location. Apparently, Gibson had instructed his sister-in-law who lives at the Pearl St. location to re-direct his calls to New Castle. Gibson told the radio dispatcher that he could not come to the door because: "Ah right now, I don't have any clothes on right now. I'll give 'em a call."

According to the WPD, Gibson compounded his dishonest conduct by collaborating with his brother Ed (a civilian WPD radio room employee) to support his version of his location that morning. In a transcript of a conversation with his brother on the afternoon of July 16th, Gibson asks him: "Did anybody ask you anything?" Ed replies: "Let me call you back on an . . ." Apparently, Gibson later admitted under questioning from Sergeant Hartsky (the police investigator in his case who also served as prosecutor at the administrative hearing) that Ed was referring to an "untaped line." Gibson also admitted that he and his brother "c[a]me up with an idea of what should be said [to Sergeant Ciotti] in case [the matter] came back up later." Additionally, he admitted that they agreed to say that Gibson had been in his room all along.

Ciotti believed that he had been lied to, and began an investigation of Gibson regarding possible dishonesty and residency rule violations. Sergeant Hartsky of the Office of Professional Standards ("OPS") interviewed Gibson, who

was represented by counsel. After the interview and upon completion of her investigation, Hartsky charged Gibson with two counts of dishonesty and one count of failure to follow the sick leave policy. As described above, WPD Directive 7.3D, the "Honesty Directive," states: "Members and employees are required to be truthful and forthright at all times. Violation of this regulation will result in disciplinary action as specified for a class 'A' violation, with the only applicable penalty being dismissal." Thus, if found guilty of the dishonesty charges, Gibson faced certain dismissal.

An administrative hearing before the Complaint Hearing Board ("Board") ensued on December 13, 1999. Captains Crowley, Maggitti, and Dietz were randomly selected to hear the case. Prior to the hearing, Hartsky hand-delivered a trial "packet" to Gibson's attorney and to each member of the Board. The packet contained a copy of each item that OPS was to present at the hearing: a descriptive statement of each of the three charges against Gibson; Hartsky's investigative report; a departmental information report prepared by Ciotti; transcripts of OPS's August 24, 1999 and September 8, 1999 interviews with Gibson's brother Ed; a transcript of OPS's August 30, 1999 interview with Gibson; transcripts of the July 16, 1999 phone calls; the Illness Leave report filled out by Stevenson recording Gibson's 5:36 a.m. sick leave call; and Gibson's thirteen page memorandum outlining his factual and legal contentions.

The hearing lasted a full day and each side was given the opportunity to submit evidence and to call witnesses. During the hearing, which was videotaped, Hartsky played the audiotape recordings of the four phone calls that had been recorded: the Data Center's 12:30 p.m. call to Gibson with Ciotti on the radio; Ed's 1:55 p.m. call to Gibson; Ciotti's 2:40 p.m. call to Ed; and Ed's 2:45 p.m. call to Gibson. At the conclusion of the December 13th hearing, the Board found Gibson guilty of each of the three charges. On December 17, 1999, Gibson filed an appeal to the Appeal Board. The Appeal Board consisted of the Chief of Police, a representative from the City's Personnel Department, and the Vice-President of the Fraternal Order

of Police. The Appeal Board convened on February 29, 2000 and unanimously upheld the Board's decision to discharge Gibson.

On August 20, 2000, Gibson filed a wrongful discharge suit in the District Court against the Mayor and Council of the City of Wilmington pursuant to 42 U.S.C. § 1983. In his complaint, Gibson alleged that the WPD had terminated him pursuant to a vague and overbroad municipal policy which infringed his First Amendment right to free speech. Gibson also claimed that the Board's ex parte proceedings (i.e. receiving the packet of materials before the hearing) resulted in a biased Board. Finally, he argued that Marlyn Dietz ("Dietz"), one of the members of the Board, was actually biased against him.

Gibson moved for summary judgment on the issue of overbreadth and vagueness. The District Court denied the motion stating that there were "genuine issues of material fact to be resolved by the fact finder." Gibson also moved for summary judgment on the two alleged due process violations of the Board's receipt of the packets in advance of the hearing and of actual bias, or at least the appearance of impropriety, stemming from Dietz' sitting on the Board.[1] Summary judgment was also denied on both those counts. The due process claims were ultimately resolved against Gibson by the jury at trial.

On September 9, 2002, the morning of a scheduled eight-day trial, the District Judge invited counsel into chambers

1. Gibson moved for Dietz' recusal from the Board on the grounds that Dietz was himself under investigation by the Board for an alleged violation of the Honesty Directive and might therefore have been under pressure to rule against Gibson in exchange for leniency in his own case. Gibson also alleged that Dietz might have had "independent knowledge of the facts and would not be an independent hearing officer" because he was in Gibson's chain of command. By letter dated November 15, 1999, the Inspector of Internal Operations informed Gibson that while it is true that OPS had previously conducted an investigation of Dietz as a result of a complaint raised by one of his subordinates, it had determined that the complaint was unfounded. Furthermore, the Inspector determined that Dietz was not in Gibson's chain of command. Therefore, Gibson's request to have Dietz removed from the Board was denied.

and announced that he was granting summary judgment *sua sponte* to Wilmington on the issue of overbreadth:

> *The Court:* The first thing we will address is the preliminary instructions. I very consciously omitted from the preliminary instruction any mention of overbreadth because I think it has been dealt with, admittedly not raised by the defense, but we are not going to spend a lot of time on that, Mr. Neuberger. It is out of the case.

> *Mr. Neuberger:* Even though they didn't move for summary judgment, Your Honor?

> *The Court:* That's right. I ruled, the ruling is clear in the memorandum and order, that is law of the case. There is not much more to say about that. . . . As a matter of law, I have ruled that the statute is not overbroad and that 7.3D, the directive is no longer in the case.

Gibson claims on appeal that this adverse ruling relegated him "to an entirely new theme of free speech retaliation, without the underlying and closely related evidence pertaining to statutory overbreadth." After an eight-day trial and nine hours of jury deliberations, the jury returned a verdict for Wilmington on nine special interrogatories. Gibson has appealed, alleging reversible error in the entering of the *sua sponte* summary judgment as well as in the reopening of the record during jury deliberations to admit the requested dictionary definitions and audio tapes of Gibson's conversations with the WPD and his brother. Gibson also appeals the District Court's refusal to admit certain character evidence into the record. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 (a) (3) and (4). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Propriety of the Grant of Summary Judgment — Procedural Issues

### A. Propriety of the Grant of Summary Judgment in Favor of a Non-Movant:

The District Court granted summary judgment to Wilmington, a non-moving party. We have previously

recognized that "authority has developed to allow a court to grant summary to a non-moving party."[2] *Chambers Dev. Co., v. Passaic County Utils. Auth.*, 62 F.3d 582, 584 n.5 (3d Cir. 1995). However, we have also held that summary judgment will not be granted to a non-moving party without "first placing the adversarial party on notice that the court is considering a *sua sponte* summary judgment motion." *Id.* The threshold question before us is therefore whether the District Court's failure to give notice that it was considering a grant of summary judgment to the non-movant constitutes a fatal procedural flaw, irrespective of the merits of the summary judgment grant itself.

### B. *Propriety of the Grant of* Sua Sponte *Summary Judgment*

It has long been established that, under the right circumstances, district courts are entitled to enter summary judgment *sua sponte. See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("Our conclusion is bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."). In the case at bar, the District Court entered summary judgment against

---

2. This authority stems largely from other Courts of Appeals, which have determined that district courts may grant *sua sponte* summary judgments to the non-moving party. *See, e.g.*, *Kassbaum v. Steppenwolf Prods., Inc*, 236 F.3d 487, 494 (9th Cir. 2000) (quoting *Cool Fuel Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982)) ("When one party moves for summary judgment and at a hearing the record reveals no genuine dispute on a material fact, 'the overwhelming weight of authority supports the conclusion that . . . the court may sua sponte grant summary judgment to the non-moving party.' "), *cert. denied*, 534 U.S. 815 (2001); *Ramsey v. Coughlin*, 94 F.3d 71, 73 (2d Cir. 1996) (stating that it is generally established that " 'the trial court is not precluded from entering summary judgment for the non-movant if, in reality, no factual dispute exists and the non-movant is entitled to summary judgment as a matter of law.' " (quoting 6 James W. Moore, Moore's Federal Practice ¶ 56.12, at 56-165 (2d ed. 1995)); *Yu v. Peterson*, 13 F.3d 1413, 1415 (10th Cir. 1993) (quoting *Cool Fuel Inc.,* at 311).

Gibson on the issues of vagueness and overbreadth, but failed to give notice of its intention to do so.[3]

From a procedural standpoint, the Federal Rules of Civil Procedure clearly require that parties be given ten days notice that a motion for summary judgment is being considered. *See* Fed. R. Civ. P. 56 (c). This Court has found that the notice requirement applies to *sua sponte* grants of summary judgment. In *Otis Elevator Co. v. George Washington Hotel Corp.* 27 F.3d 903 (3d Cir. 1994), we held:

> Under our cases, a district court may not grant summary judgment sua sponte unless the court gives notice and an opportunity to oppose summary judgment. *See Davis Elliott Intern. v. Pan American Container*, 705 F.2d 705, 707-08 (3d Cir. 1983) (" 'because the procedure of Rule 56 requiring an opportunity to present pertinent material, which

---

3. Wilmington argues that Gibson had sufficient notice that the Court was considering a grant of summary judgment against it based on the fact that the preliminary jury instructions issued by the District Court on Friday September 6, 2002 — three days before the trial was slated to begin — lacked any instructions concerning the issue of overbreadth. In other words, Wilmington's argument is that Gibson should have divined that summary judgment was pending due to what Gibson could simply have perceived as an accidental omission in the preliminary jury instructions. We find this logic underwhelming. Indeed, Gibson's response to receiving the preliminary instructions was to file a Motion to Supplement the Preliminary Jury Instructions on September 9, the morning of the trial. In that motion, Gibson reiterated that the Final Pre-Trial Order had set forth his claim that Police Manual Directive 7.3D was unconstitutionally overbroad and that because it had stated that there was an issue of fact still to be determined — namely whether the directive had been narrowed only to statements made under oath or in the discharge of official duties — the question needed to go to a jury. There is nothing in Gibson's motion to suggest that he understood the omission of instructions pertaining to overbreadth to mean that summary judgment was being contemplated against him. At all events, even if it would have been logical for Gibson to conclude that summary judgment was being considered against him based on the omission of jury instructions concerning the issue of overbreadth, we will assume that having to make such indirect inferences did not provide Gibson with adequate notice and that notice was not, in fact, given.

> presumes notice to the party so that he may take advantage of the opportunity, was not followed, the entry of judgment must be reversed' " (quoting *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir. 1980)). *See also Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069-70 (3d Cir. 1990) ("[I]n the absence of a formal motion for summary judgment, plaintiff was under no formal compulsion to marshall [sic] all of the evidence in support of his claims").

*Id.* at 910.

*Otis Elevator* thus stands for the proposition that a party must be given notice when summary judgment is being contemplated against it so that the evidence necessary to oppose the motion may be marshaled and presented to the Court.

Gibson contends that he was taken completely by surprise on the morning of the trial when the District Court Judge announced, in chambers, that he was granting summary judgment to Wilmington on the issues of vagueness and overbreadth. While this may very well be true, it is nevertheless important to note that because the Court's pronouncement came on the morning of the trial, full opportunity for discovery had already obtained. Indeed Gibson had every opportunity to present his position to the Court, and it was he who moved for summary judgment on the issues of vagueness and overbreadth. Wilmington argues that in moving for summary judgment, Gibson had clearly marshaled enough evidence to support his case and was therefore not prejudiced by the lack of notice in the *sua sponte* grant of summary judgment. This argument has merit.

In the context of *sua sponte* summary judgment, the First Circuit has defined "notice" to mean "that the targeted party 'had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.' " *Leyva v. On the Beach, Inc.*, 171 F.3d 717, 720 (1st Cir. 1999) (quoting *Jardines Bacata, Ltd. v. Diaz-Marquez*, 878 F.2d 1555, 1561 (1st Cir. 1989)). We agree. Given that it was Gibson who moved for summary judgment on the issues of vagueness and overbreadth, he

certainly had the opportunity to put his "best foot forward." Similarly, in *Ramsey,* 94 F.3d at 74, the Court held that:

> Where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law.

Thus, other courts have taken the position that when a party has had the opportunity to present all the evidence that would be used to oppose a motion for summary judgment, the fact that the actual notice was not given becomes irrelevant if the party was not prejudiced by that lack of notice.

Wilmington also contends that because the District Court granted summary judgment on a question of law, any prejudice to Gibson was virtually non-existent. Some Courts of Appeals have embraced that line of reasoning. In *Artistic Entertainment, Inc. v. City of Warner Robins*, the Eleventh Circuit distinguished "*sua sponte* grants of summary judgment in cases involving purely legal questions based on complete evidentiary records," from cases "involving factual disputes where the non-moving party has not been afforded an adequate opportunity to develop the record." 331 F.3d 1196, 1201 (11th Cir. 2003) (per curiam). The Court explained that where a "legal issue has been fully developed, and the evidentiary record is complete, summary judgment is entirely appropriate even if no formal notice has been provided." *Id.* at 1202 (citing *Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999)). Similarly, in *Osler Institute Inc. v. Forde*, 333 F.3d 832, 836 (7th Cir. 2003), *petition for cert. filed* 72 U.S.L.W. 3356 (U.S. Nov. 10, 2003) (No. 03-706), the Court of Appeals held that when a District Court decides to resolve purely legal issues before trial, a *sua sponte* grant of summary judgment may be in order, even if the non-moving party did not appreciate that notice was being given.

These courts have fashioned a set of exceptions to the notice requirement that plainly make sense and we do not see these holdings as inconsistent with our own jurisprudence in *Otis Elevator*. While there are three different grounds on which we could recognize an exception to the notice requirement in the case of *sua sponte* summary judgment — the presence of a fully developed record, the lack of prejudice, or a decision based on a purely legal issue — we need not decide if fewer than all three would suffice as all three are present in the case at bar. Hence, we will follow the lead of those Circuits that have carved out an exception to the notice requirement for *sua sponte* grants of summary judgment and hold that the District Court did not commit procedural error in its grant of summary judgment to Wilmington on the issues of vagueness and overbreadth.

In so doing, however, we add a cautionary note: the *sua sponte* grant of summary judgment, without giving notice to the parties, is not the preferred method by which to dispose of claims. This is so not only because district courts run the risk of unduly prejudicing the parties, but also because such grants of summary judgment can have serious, if unintended, consequences. As we noted earlier, Gibson contends that the grant of summary judgment relegated him "to an entirely new theme of free speech retaliation, without the underlying and closely related evidence pertaining to statutory overbreadth." The fact that Gibson did not at any point, in chambers or later in the trial, object to the *sua sponte* grant of summary judgment based on the way in which it would affect his trial strategy, suggests that the trial strategy prejudice claim was fashioned ex post facto for the purposes of the appeal.[4] Nonetheless, we wish

---

4. Arguably, when the District Court granted summary judgment *sua sponte* on the morning of the trial, it simultaneously — if unintentionally — amended the Final Pretrial Order, dated April 29, 2002, which had made clear that vagueness and facial overbreadth were issues to be tried before the jury. Federal Rule of Civil Procedure 16 (e) states:

> **Pretrial Orders.** After any conference held pursuant to this rule, an order shall be entered reciting the action taken. This order shall control the subsequent course of action unless modified by a

to make clear that it is preferable for the District Court to give notice to the parties when it is considering a *sua sponte* grant of summary judgment because of the potential consequences such a grant may engender.

## III.  Vagueness and Overbreadth

### A.  Vagueness

Gibson contends that Directive 7.3D is unconstitutionally vague because the term "forthright" is so vague that a person of ordinary intelligence is not provided with reasonable notice as to what conduct or speech is or is not proscribed by it. This contention is legally untenable. A statute or regulation must fail for vagueness if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning." *Connally v. Gen. Constr.* Co., 269 U.S. 385, 391 (1926). However, if the challenged regulation clearly applies to the challenger's conduct, he cannot challenge the regulation for facial vagueness. *See Parker v. Levy*, 417 U.S. 733, 755-56 (1977). During his deposition, Gibson was asked why he gave the data center incorrect information as to his location. He replied: "I know that ah I was supposed to be at 1208 Pearl Street, and if I wasn't there, then I

---

subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.

The District Court *sua sponte* granted summary judgment to Wilmington on September 9, 2002, the morning of the trial, well after the Final Pretrial Order had been entered. Not only was there no subsequent order modifying the Final Pretrial Order, but there was also no "manifest injustice" that would have required such a modification to occur. Thus, while the grant of summary judgment was valid on its own merits (as we explain below in Part III), the ramifications of that grant were potentially damaging in terms of Gibson's particular trial strategy. Gibson, however, did not object — either in chambers that morning or at any point in the trial — to the grant of summary judgment on the basis that it was undermining his trial strategy. Because Gibson failed to raise a timely objection, any review of the District Court's amendment of the Final Pretrial Order would be only for plain error, and the rigorous requirements of the plain error doctrine are clearly not met. *See United States v. Knight*, 266 F.3d 203, 206 (3d Cir. 2001).

knew that I would be facing disciplinary action." He also admitted, in terms, that he was not "forthright." *See* discussion *infra* Part IV. B. To suggest that Gibson did not understand that he was being untruthful or that he did not understand that his behavior was not forthright just does not hold up in light of the facts.

Furthermore, a vagueness attack requires the plaintiff to show that he himself was injured by the vague language of the regulation. *See Rode v. Dellaciprete*, 845 F.2d 1195, 1200 (3d Cir. 1988). Gibson can make no such showing here as he was injured as a result of his lies to a supervising officer, not because of the supposed vagueness of the regulation.

### B. Overbreadth

Gibson contends that because the directive's plain language — "[m]embers and employees are required to be truthful and forthright at all times"— does not limit the speech or conduct to the discharge of official duties or to statements made under oath, the directive is overly broad and the exercise of constitutionally protected speech will be chilled by the directive's overbreadth.

Under First Amendment overbreadth analysis, a court may invalidate a statute that is substantially overbroad "even though the conduct of the person making the attack is clearly unprotected and could be proscribed by a law drawn with the requisite specificity." *See New York v. Ferber*, 458 U.S. 747, 769 (1982) (citations omitted). However, "because invalidation for facial overbreadth is 'strong medicine,' there are nonetheless limits to its application." *Aiello v. City of Wilmington*, 623 F.2d 845, 852 (3d Cir. 1980). In a facial challenge to the overbreadth of a law, "a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). Although the Supreme Court has not explicitly listed the factors to be considered in an overbreadth analysis, those factors have been identified as "the number of valid applications, the historic or likely frequency of conceivably impermissible applications, the nature of the activity or conduct sought to

be regulated, and the nature of the state interest underlying the regulation." *Aiello*, 623 F.2d at 860 (Sloviter, J., concurring in part and dissenting in part). We apply Judge Sloviter's useful analysis.

The directive at issue states that "[m]embers must be truthful and forthright at all times." Analyzing this directive in light of the four factors enunciated by this Court, we conclude that the directive is not substantially overbroad. The first and second factors we look at together, since they amount to a comparison. There will clearly be a high number of instances where there will be valid applications of this directive. The WPD obviously needs to have truthful and forthright speech and conduct from its employees, both in their dealings with the public and within the organization; a police department could not otherwise fulfill its mission of assuring public safety.

Gibson advances several scenarios in which there could be invalid applications of the directive. While we do not dispute that some marginal amount of speech or conduct may potentially be chilled by this directive, we find the scenarios advanced by Gibson to be more than slightly unrealistic. For example, Gibson contends that, as written, the directive would enable Wilmington to fire a police officer for lying to his son about being sick in order to avoid having to attend the child's little league baseball game. It is in the conceivable realm of possibility that such an event could occur, but we agree with the *Magill* Court that:

> Some sensitivity to reality is needed; an invalid application that is far-fetched does not deserve as much weight as one that is probable. The question is a matter of degree; it will never be possible to say that a ratio of one invalid to nine valid applications makes a law substantially overbroad.

*Magill v. Lynch*, 560 F.2d 22, 30 (1st Cir. 1977).

In the case at bar, the number and weight of permissible applications far outweigh the possible invalid applications, if not in number, then certainly in kind. This conclusion is unaffected by Gibson's enumeration of other hypothetical

scenarios for which an untruthful police officer could potentially be fired, set forth in the margin.[5]

Furthermore, the third factor, the nature of the conduct or activity to be regulated, clearly favors Wilmington and might even be dispositive of the analysis. The directive states that members of the WPD must be "truthful and forthright" at all times. What the directive proscribes would therefore seem to be speech or conduct that is not truthful and not forthright. Untruthful speech is not protected by the First Amendment. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council Inc.*, 425 U.S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake.") Gibson contends that there are a number of instances in which lies or untruthful speech have received First Amendment protection. He relies particularly on *Cantwell v. Connecticut*, 310 U.S. 296 (1940), where the defendants were convicted for unauthorized soliciting because they distributed religious books, pamphlets, and periodicals and convinced passers-by to listen to records promoting their religious beliefs. In holding the Connecticut statute unconstitutional, the Court held that in the realms of political belief and religious faith, people sometimes resort to "exaggeration, to vilification of

5. Relying on deposition testimony from Wilmington's Mayor James Sills, Public Safety Director David Bostrom, and Chief Michael Boykin, who were asked to opine on an array of imaginary situations, Gibson contends that the police department itself admits that an officer might be fired for any of the following reasons: lying about an off–duty, extramarital affair if it were somehow related to job performance; not having told his wife that he is supporting a child from a prior relationship; lying to his wife about being seen with another woman; making a political speech and intentionally misstating facts about the opposing candidate; and prevaricating when questioned about his private life, voting record, union activities or church attendance, whether on- or off- duty. Gibson did not adduce evidence that anything like this had ever happened. While these scenarios lend marginal support to Gibson's overbreadth claim, they do little to advance the reality of the frequency or likelihood of the directive's invalid application. Gibson's counsel are experienced constitutional litigators, but these myriad hypothetical situations, which must be the best they could come up with, just do not persuade us that the WPD has applied, or will apply, the directive impermissibly with any degree of frequency.

men who have been, or are, prominent in church or state, and even to false statement," but that "in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Id.* at 310.

We find *Cantwell* distinguishable. While it is true that certain types of false statements seem to be protected, they are false statements that ultimately promote an "uninhibited marketplace of ideas." *Virginia v. Hicks*, 123 S. Ct. 2191, 2196 (2003). The bulk of the conduct that this directive reaches is not of this variety. Rather, it reaches the petty lies or untruths of everyday life and, of course, the sort of intentional lies — such as lying to one's supervisor about one's whereabouts when reporting sick — at issue in this case. In *Gertz v. Robert Welch, Inc.*, the Court held that:

> [T]here is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open" debate on public issues. *New York Times Co. v. Sullivan*, 376 U.S. [254,] 270 [(1964)]. They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

418 U.S. 323, 340 (1974).

Although there would certainly be some social value obtained by not regulating the speech of police officers, that value is clearly outweighed by the interest the WPD has in maintaining the efficient operation of its police force and the public trust.

The fourth factor is the nature of the state interest underlying the regulation. The WPD has advanced a legitimate and important state interest in support of its honesty directive, namely the preservation of the public's trust as well as the unimpeded operation of the police

department's work where an officer's credibility on the witness stand can play a crucial role. Gibson contends that the same goals could be achieved with a more narrowly tailored provision and cites examples of other police departments that have tailored their honesty directives to apply only to situations where the officers are carrying out official functions.[6] We do not dispute that the Wilmington directive could certainly be more narrowly drawn and would benefit from being rewritten. However, we do not believe that the directive reaches a substantial amount of constitutionally protected conduct.

In summary, as we have already stated, substantial overbreadth is determined first by comparing the number of valid applications to the likelihood and frequency of impermissible applications. Having considered the types of impermissible applications advanced in this case, we have concluded that the number and type of valid applications outweigh not only the likelihood, but more importantly the nature of potential invalid applications. We have also concluded that lies and untruthful statements are protected under First Amendment jurisprudence only in those rare instances where they contribute to the "uninhibited marketplace of ideas." *Hicks*, 123 S. Ct. at 2196. Such is not the nature of the substantial bulk of lies regulated here. Finally, the WPD's decision to implement an honesty directive to promote and preserve the public trust supports a legitimate and important state interest. We will therefore

---

6. *See, e.g.*, Directive 9.5 of the City of Newark, Delaware's Police Department which reads:

9.5 Truthfulness

i. Each employee is required to be truthful at all times during any Judicial or administrative proceedings or when giving a deposition. (Group V).

ii. Each employee is required to be truthful at all times when speaking with fellow employees and responding to questions from the general public. (Group III).

iii. Deception is acceptable only when it may be required to conduct a proper investigation or while working in an undercover assignment.

19

affirm the District Court's determination that the directive was not substantially overbroad as a matter of law.

## IV.  Reopening the record

A court's decision to reopen or supplement the record once deliberations have begun is reviewable only for abuse of discretion. *See Natural Res. Def. Council, Inc. v. Texaco Refining & Mktg. Inc.*, 2 F.3d 493, 504 (3d Cir. 1993). Great flexibility is accorded the District Court in its determination to supplement the record, though it must avoid perpetrating any type of injustice in so doing. *Cf. Rivera-Flores v. P. R. Tel. Co.*, 64 F.3d 742, 746 (1st Cir. 1995) ("While the particular criteria that guide a trial court's decision to reopen are necessarily flexible and case-specific, it is generally understood that a trial court abuses its discretion if its [action] works an 'injustice' in the particular circumstances."). In determining whether an "injustice" will occur, the district court must consider several factors, including the burden that will be placed on the parties and their witnesses, the undue prejudice that may result from admitting or not admitting the new evidence, and considerations of judicial economy. *See Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 894 n.6 (3d Cir. 1978).

### A.  The three audiotapes

During the course of the trial, the jury watched extensive excerpts from videotapes made of Gibson's administrative hearing. In viewing those videotapes, the jury heard the audio recordings of the three telephone conversations between Gibson and his brother, as well as the call made to Gibson from the WPD with Sgt. Ciotti on the radio. The videotapes, the transcript of the videotapes, and the transcript of the recorded telephone conversations were all admitted into evidence. During closing arguments, Gibson argued (apparently for the first time), that if the jury watched the videotape portion of the phone conversations, "they would conclude that (like Gibson) they could not understand what Ed Gibson was saying over the phone line. No person could have picked up what Ed was saying to Chris at the end of his conversation, let alone some double entendre that showed he joined in his brother's lie. Thus, Gibson could not have been a liar because he did not understand what was being said." (Brief, p.47).

Shortly after deliberations began, a request was sent to the Court. "We need a dictionary, TV and VCR and Trial Board tape, recording of Data Center tapes made July 16, 1999." The nature of the request showed that the jury wanted not just to watch the videotape (as they were urged to do by Gibson), but also wanted to listen to the actual audio recordings of the phone conversations that had been played at the administrative hearing. Those audio tapes had never been offered or received into evidence at trial (though the transcripts of the phone conversations had been). Gibson argues that by allowing the jury to listen to those audio tapes, the Court "allowed the defense to circumvent plaintiff's counsel's final argument which was based on the record as *presented*, and not on a new audio tape subject to different interpretations as to its content, scope and the impact of noise bleeding into it." (emphasis in original). We are unpersuaded.

In his closing argument at trial, Gibson argued that the quality of the sound on the phone lines was so poor as to render Gibson unable to understand what was being said to him during the course of the conversations. Yet Gibson now argues that listening to the actual recordings of the phone conversations as opposed to a videotape of a playback of the recording of the phone conversations would unduly prejudice him. By his own logic, the concern here should not be whether the sound quality on the *video* was poor, but whether the sound quality on the *phone line* was poor.

When Gibson's counsel objected to the introduction of the audio tapes, the District Court suggested that the audio tapes be listened to in chambers. After listening to the tapes, the Court stated:

> My recollection of attempting to discern what was on the videotape was that it was pretty difficult at the time these calls were played. If this is, in fact, the tape that the trial board officers heard, Mr. Neuberger, don't you think that the jury should have the benefit of understanding, as you like to say, the context, that is, providing for the jury an understanding of what the evidence was that the board acted upon? They didn't act upon, apparently — the tape that we heard, as I

have just indicated, was unintelligible. This is not. It seems to me this is a significant issue in the case, that you have made it one.

Over counsel's objections, the District Court proceeded to admit audio tapes that had already been heard by the jury via the video tapes, and which Gibson had alleged were unintelligible. The allegation that in so doing the District Court "took sides in the trial of the case and bailed out the defendants in their chosen trial strategy" is unconvincing given that it was Gibson who brought the intelligibility of the phone conversations into question. The District Court's decision to allow the jury to listen to the audio tapes was not an abuse of discretion.[7]

### B.   The two dictionary definitions

The Supreme Court has stated that "when a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946). Here, the jury asked the Court for a dictionary. The District Court was disinclined to provide the jurors with a dictionary, stating to counsel in chambers: "As we all know, we don't permit jurors to embark upon their own research, their own quest for information." To prevent any dictionary misuse, the District Court asked the jury to specify the words for which it needed definitions: "The Court and the parties have received your request for a dictionary. In the space provided below, please list the word or words or term or terms you wish to define. It is not necessary to provide an explanation of why you wish to define those words or terms." The jury submitted its request for definitions for the words "forthright" and "motivating." With the input of counsel, the District Court decided to provide photocopied definitions for

---

7. Gibson's counsel makes the further argument that he had objected to the authenticity of the tapes in chambers but that he was forced to withdraw his objection because he did not want to cause further prejudice to his client by having the jury see him question the authenticity of the tapes. However, there is nothing in the record of this conversation in chambers that suggests that he was "forced" to withdraw his objection, nor that authentication could not have taken place without the jury present.

the two words out of the abridged version of Webster's Ninth New Collegiate Dictionary.[8]

Gibson argues that he was unduly prejudiced by the jury's receipt of a dictionary definition of the word "forthright," because the meaning of the word forthright was a key issue at trial. Part of Gibson's argument at trial was that a reasonable person would have no understanding, and therefore no notice, as to the meaning of the word "forthright." Gibson further argues in the appellate brief that the very fact that the jury asked for a definition of the word demonstrates that the word was confusing and ambiguous enough to prevent average people from understanding it.

This contention has no merit. During the course of the police investigation and of the trial, Gibson himself demonstrated a perfectly good understanding of the word "forthright." In response to a question during the police investigation, Gibson used the word "forthright" in contradistinction to the word "truthful" without being prompted to do so:

> *Police Investigator*: . . . are you being totally truthful when you were talking to the Data Center?

> *Gibson*: I'm being ah I'm being ah truthful probably but not forthright.

On cross-examination at the trial, Gibson was asked to what he meant by the word forthright, as he had used it in his answer to the police investigator.

> *Counsel*: What do you mean by the word forthright?

> *Gibson*: What do I mean?

---

8. The relevant definitions read as follows:

   1.  forthright *adv.* 1 a: directly forth or ahead b: without hesitation: frankly 2 *archaic*: at once.

   2.  forthright *adj.* 1 archaic: proceeding straight on 2: free from ambiguity or evasiveness: going straight to the point.

   motivate *vt* -**vated**; -**vating** (1885): to provide with a motive: IMPEL.

Webster's Ninth New Collegiate Dictionary 486, 774 (1986).

> *Counsel*: Yes.
>
> *Gibson*: Sir, you're asking me for my definition?
>
> *Counsel*: I am.
>
> *Gibson*: To be. . . . (Pause). I don't know. To be candid, frank.

Gibson's subsequent contention that he did not know what forthright meant and that providing the jury with a definition would prejudice the deliberations against him is simply belied by the record.

In our view, the District Court did not abuse its discretion when it provided the jury with the definitions of the words "motivating" and "forthright" at the jury's request.[9] In fact, it declined to send in a dictionary and inquired further as to the jury's exact need so that it could specifically tailor the supplemental instructions. Such judicial tailoring of supplemental instructions was deemed the preferred procedure in *United States v. Birges*, 723 F.2d 666, (1984):

> Questions or disputes as to the meaning of terms which arise during jury deliberations should be settled by the court after consultation with counsel, in supplemental instructions. Such guidance will avoid the danger that jurors will use the dictionary to construct their own definitions of legal terms which do not accurately or fairly reflect applicable law.

---

9. With respect to providing the jury with a dictionary definition of "motivating," Gibson does not even allude to any prejudice arising from the provision of this word, as his entire argument focuses on the prejudice that allegedly accrued from providing a definition of the word "forthright." In all likelihood, the jury asked for a definition of the word "motivating" to help it understand the meaning of a "substantial and motivating factor," one of the elements in the free speech retaliation charge. Providing a plain English language definition of a legal term is not problematic if the supplemental definition does not alter the essential meaning of the word. *See United States v. He*, 245 F.3d 954 (7th Cir. 2001). Here, there is no contention that the supplemental definition altered the meaning of the word "motivating," and the District Court clearly did not abuse its discretion in providing a dictionary definition for the word.

*Id.* at 670-71.

Here, the District Court took seriously its responsibility to be as precise as possible and provided the jury with exactly what was needed, no more and no less. The Court did not abuse its discretion in providing the two requested dictionary definitions.

## V. Federal Rule of Evidence 405 (b)

Gibson contends that Wilmington's entire defense strategy was to attack Gibson as being a liar and, by implication, a bad cop. Gibson argues that the District Court therefore abused its discretion when it refused to allow Gibson to introduce seven documents that would have helped to rebut those charges and would have shown Gibson's propensity for truthfulness. Wilmington, on the other hand, argues that it never put Gibson's character into question but rather sought only to prove that he was dishonest in his dealings with his supervisor on July 16, 1999, the day he called in sick.

A District Court's evidentiary rulings are reviewed for abuse of discretion. *See Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 145 n.2 (3d Cir. 2002) (citing *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1213 (3d Cir. 1995)). The definition of relevant evidence is very broad. Under Fed. R. Evid. 401, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." We have held that Rule 401 "does not raise a high standard." *Hurley v. Atl. City Police Dept.*, 174 F.3d 95, 109-110 (3d Cir. 1999). We have also held that "evidence is irrelevant only when it has no tendency to prove [a consequential fact]," and that while Rule 401 gives "judges great freedom to admit evidence, [it] diminishes substantially their authority to exclude evidence as irrelevant." *Spain v. Gallegos*, 26 F.3d 439, 452 (3d Cir. 1994) (citations omitted).

Among the documents that Gibson wanted to have admitted were Gibson's last two employee performance reviews, which according to Gibson "reflect acceptable performance and give no indication that he demonstrates any trait consistent with the claim that he was a liar,

dishonest and not forthright," and which supposedly contained "positive evaluations of characteristics of pride, deportment, judgment and cooperation which make any trait of dishonesty less probable." Gibson also wanted to introduce letters from the Chief of Police stating that Gibson displayed initiative, dedication, teamwork, and a "can do" attitude as well as letters from the Mayor of Wilmington stating that Gibson displayed dedication, commitment, hard work, courage and good work.

Gibson argues that since character was made a central issue in this case, these documents should have been admitted pursuant to Fed. R. Evid. 405 (b) because they tended to show that Gibson was not a dishonest or untruthful cop. Fed. R. Evid. 405 (b) states: "In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct." The question for us is to determine whether, in fact, Wilmington made Gibson's character an "essential element" of the "charge, claim, or defense."

Character evidence does not constitute an "essential element of a claim or charge unless it alters the rights and liabilities of the parties under the substantive law." *Schater v. Time, Inc.*, 142 F.3d 1361, 1371 (11th Cir. 1998); *see also United States v. Keiser*, 57 F.3d 847, 856 & n.20 (9th Cir. 1995); *Perrin v. Anderson*, 784 F.2d 1040, 1045 (10th Cir. 1986) (citing McCormick on Evidence § 187 at 551 (3d ed. 1984)). The advisory committee's notes to the Federal Rules of Evidence provide two examples in which character evidence constitutes such an essential element: "[1] the chastity of a victim under a statute specifying her chastity as an element of the crime of seduction, or [2] the competency of the driver in an action for negligently entrusting a motor vehicle to an incompetent driver." Fed. R. Evid. 404 (a) adv. comm. note (explaining that Rule 404 does not exclude such evidence because it is not offered to prove conduct consistent with character).

Gibson contended, both in open court and in chambers, that Wilmington was putting Gibson's character at issue in the case by trying to make him out to be a "bad" or "lying" cop. In one particularly illuminating discussion in

chambers, Gibson's counsel stated that: "there is a false impression I think for the jury that this police officer was a bad police officer." The Court replied: "No, I think that is the theory *you* have advanced. I don't think there has been a false impression created within the context of the evidence in my view." (emphasis added). The Court further stated:

> [T]here is considerable evidence on the record from sources both documentary and live testimony that Christopher Gibson was a very effective police officer in his role as a community police officer, as a drug elimination officer, when he was working for the WHA and when he was in the weed-and-seeder. I think there is ample and plenty of evidence in the record to support that conclusion, contrary to what you are advancing, Mr. Haverly.

It is obvious from this exchange that the District Court did not believe that Gibson's character was being put into issue, a conclusion with which we agree. Wilmington advanced evidence of the allegedly untruthful statements that Gibson made on July 16, 1999, the day he called in sick. There were no overarching allegations that he was otherwise a dishonest or lying cop. The District Court did not abuse its discretion by not allowing rebuttal evidence in this circumstance since he correctly concluded that character had not been made an essential element of the defense.

## VI. Conclusion

For the foregoing reasons, the judgment of the District Court will be affirmed.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*
