

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-28-2006

# Ser Empl Intl Union v. Mun Mt Lebanon

Precedential or Non-Precedential: Precedential

Docket No. 04-4646

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

## Recommended Citation

"Ser Empl Intl Union v. Mun Mt Lebanon" (2006). *2006 Decisions.* Paper 1167.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1167

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

—————

NO. 04-4646

—————

SERVICE EMPLOYEES INTERNATIONAL
UNION, LOCAL 3; RACHEL CANNING;
VELVET HAZARD,
Appellants

v.

MUNICIPALITY OF MT. LEBANON

—————

On Appeal From the United States
District Court
For the Western District of Pennsylvania
(D.C. Civil Action No. 04-cv-01651)
District Judge:  Hon. Arthur J. Schwab

—————

Argued December 13, 2005

BEFORE:  SLOVITER, SMITH and STAPLETON,
Circuit Judges

(Opinion Filed:  April 28, 2006)

———————

Michael J. Healey
Healey & Hornack
1100 Liberty Avenue
The Pennsylvania - Suite C-2
Pittsburgh, PA 15222
  and
Witold J. Walczak (Argued)
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA  15213
  Attorneys for Appellants

James H. Roberts (Argued)
Kathryn L. Hunter
Eckert Seamans Cherin & Mellott
600 Grant Street - 44th Floor
Pittsburgh, PA  15219
  Attorneys for Appellee

Paul D. Polidoro
Watchtower Bible & Tract Society of New York, Inc.
Legal Department
100 Watchtower Drive
Patterson, NY  12563
  Attorney for Amicus Curiae

———————

OPINION OF THE COURT

_____

STAPLETON, Circuit Judge:

The Municipality of Mt. Lebanon ("Mt. Lebanon"), by ordinance, requires door-to-door canvassers who plan to "hand pamphlets or other written material" to residents or discuss with them "issues of public or religious interest" to first register with the police department. We conclude that this ordinance violates the First and Fourteenth Amendments' guarantee that no State shall abridge the freedom of speech.

I.

The plaintiffs are a local labor organization, Service Employees International Union, Local #3, and two volunteers, Rachel Canning and Velvet Hazard (collectively, "SEIU"), who were involved in a get-out-the-vote campaign preceding the 2004 presidential election. SEIU recruited over 1,000 volunteers to go door-to-door in Allegheny County, Pennsylvania, including in Mt. Lebanon, to emphasize the importance of the election, to encourage people to vote, and to help them locate their assigned polling places.

The defendant, Mt. Lebanon, is one of a number of municipalities in Allegheny County that regulate door-to-door canvassing and solicitation. Part 3 of Mt. Lebanon's municipal code regulates those who "solicit" and "canvass" in Mt. Lebanon. It provides, in pertinent part:

§ 302 <u>Permit Required</u>. It shall be unlawful for any Person to Solicit in the Municipality without first obtaining a permit therefor as provided in this Part 3. It shall be unlawful for any Person to Canvass in the Municipality without first registering with the Police Department as provided in this Part 3.

§ 303 <u>Definitions</u>. . . .

***

<u>Canvass</u>: To go from door-to-door in the Municipality, other than to "solicit" as defined in this Part 3, to hand pamphlets or other written material to an occupant of a residence, or to discuss with such occupant issues of public or religious interest.

***

<u>Solicit</u>: To go from door to door in the Municipality (i) soliciting contributions or pledges for contributions, or (ii) selling or attempting to sell subscriptions, products or services, or taking orders or attempting to take orders for subscriptions, products or services from or to an occupant of a residence.

4

App. at 38. Section 316 provides that to register as a "Canvasser" with the police department, individuals must present photo identification and the following information in writing:

> 316.1 The name and the home address of the individual or individuals who will be canvassing in the Municipality.
>
> 316.2 The dates and hours during which the individual(s) will canvass in the Municipality.
>
> 316.3 The locations in which the individual(s) will canvass in the Municipality.

*Id.* at 42. Those who intend to "solicit" must present more detailed information in a sworn application. In addition, there is a $50 fee for each solicitation permit, which is waived for those persons soliciting only one time within any calendar year. The police chief must issue the permit if the information is complete and the requisite fees are paid.

SEIU filed suit against Mt. Lebanon just before the 2004 presidential election, alleging that the solicitation and canvassing ordinance violated the First Amendment, both facially and as applied. SEIU sought declaratory relief and preliminary injunctive relief. The complaint alleged that SEIU's volunteers planned "to go door-to-door" in Mt. Lebanon. Compl. ¶ 10, App. at 30. Those volunteers, it alleged, "will hand out literature, emphasize the importance of this year's

presidential election, encourage the people to vote, and help the voters determine their proper polling location." Compl. ¶ 11; App. at 30. SEIU further alleged that it did "not have the time and resources to register each canvasser individually." Compl. ¶ 39; App. at 35.

SEIU simultaneously filed a motion for temporary restraining order and/or preliminary injunction. After a hearing, SEIU and Mt. Lebanon resolved the preliminary-injunction motion through a consent order that delineated the terms under which the canvassers could canvass in the municipality until Election Day. The parties subsequently filed cross-motions for summary judgment on SEIU's remaining claims for declaratory and permanent injunctive relief.

The District Court ruled that SEIU does not have standing to challenge the solicitation permitting requirement because the plaintiffs "are ***not*** soliciting and have no plans to do so" and there is no concrete injury in fact sufficient to create a justiciable "case or controversy" under Article III of the Constitution. App. at 20. It granted summary judgment in favor of Mt. Lebanon, however, with respect to the "canvassing" segment of the ordinance. This timely appeal followed.

II.

SEIU seeks to mount facial challenges both to Mt. Lebanon's regulation of canvassing and to its regulation of soliciting. We agree with the District Court that SEIU lacks standing to mount a challenge to Mt. Lebanon's regulation of soliciting.

6

At the outset, we note that under the terms of the ordinance, canvassing and soliciting are two distinct and mutually exclusive activities. Further, separate regulatory requirements attach depending on which activity an individual plans to engage in. Accordingly, we separately consider SEIU's two challenges to the ordinance, including SEIU's standing to bring each challenge. *See Allen v. City of Louisiana*, 103 U.S. 80, 83-84 (1881) ("It is an elementary principle that the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected."); *Granite State Outdoor Adver., Inc. v. City of Clearwater*, 351 F.3d 1112, 1116-1119 (11th Cir. 2003) (separately examining plaintiff's injury-in-fact for each provision of facially challenged ordinance);[1] *cf. Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990, 996 (3d Cir. 1993) ("Severing statutes to limit standing promotes the twin goals of avoiding unnecessary constitutional adjudication and sharpening the presentation of the issues.").

Article III of the Constitution limits the jurisdiction of

---

[1]A subsequent Eleventh Circuit decision questioned the *City of Clearwater* court's approach of separately examining standing for each provision of the city ordinance in a facial challenge to the ordinance. *See Tanner Adver. Group, L.L.C. v. Fayette Cty.*, 411 F.3d 1272, 1275-77 (11th Cir. 2005). The *Tanner* opinion has since been vacated for *en banc* rehearing. *Turner Adver. Group L.L.C. v. Fayette Cty.*, 429 F.3d 1012 (11th Cir. 2005).

federal courts to resolving "cases" and "controversies." "To satisfy the 'case' or 'controversy' requirement of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997).

The Supreme Court has also identified a number of prudential limits on standing. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984). Among these prudential limits is the requirement that a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). In the First Amendment context, however, courts relax the prudential requirement that a litigant raise his own rights and interests. Under the First Amendment overbreadth doctrine, even though a party whose conduct could constitutionally be proscribed by statute may not normally be heard to complain that the statute under which he is prosecuted is so broad that it proscribes constitutionally protected conduct, courts will allow the party to raise the claims of others when protected speech is at issue. Courts do so out of concern that protected speech will be chilled by the statute. *Id.* at 956-57. "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601,

612 (1973). But such litigants, of course, must still meet the constitutional requirement of injury-in-fact because their own constitutionally unprotected interests will be adversely affected by application of the statute. *See* Note, *Standing to Assert Constitutional Jus Tertii*, 88 Harv. L. Rev. 423, 424 (1974) ("[O]verbreadth attacks involve both the application of the challenged law to the claimant and a different, hypothetical application of the law to third parties."); *see also* Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 *Yale L. J.* 853, 860 n.33 (1991).

The Supreme Court's decision in *Munson* is illustrative. In that case, the Supreme Court allowed a professional fundraiser, Munson, to raise the First Amendment rights of his clients, charitable organizations. Munson challenged a statute that prohibited charitable organizations, "in connection with any fundraising activity, from paying or agreeing to pay as expenses more than 25% of the amount raised." 467 U.S. at 950. Munson suffered actual and threatened injury from the statute because Munson's contracts called for payments in excess of 25 percent of the funds raised for a given event and one of Munson's charitable clients was consequently reluctant to enter into a contract with Munson. *Id.* at 954-55. The Court allowed Munson to invoke the First Amendment rights of his clients because he met the constitutional requirements for standing:

> The fact that, because Munson is not a charity, there might not be a possibility that the challenged statute could restrict Munson's own First Amendment rights does not alter the analysis. Facial challenges to overly broad

9

statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society–to prevent the statute from chilling the First Amendment rights of other parties not before the court. Munson's ability to serve that function has nothing to do with whether or not his own First Amendment rights are at stake. *The crucial issues are whether Munson satisfies the requirement of "injury-in-fact,"* and whether it can be expected satisfactorily to frame the issues in the case.

*Id.* at 958 (emphasis added); *Mothershed v. Justices of the Supreme Court*, 410 F.3d 602, 610 (9th Cir. 2005) (citing *Munson*, 467 U.S. at 958); *see also Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (stating that litigants may bring actions on behalf of third parties provided, *inter alia*, that the litigant has "suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the case"); *Eisenstadt v. Baird*, 405 U.S. 438, 443-46 (1972) (allowing individual convicted of distribution of contraceptives to raise Due Process rights of unmarried persons in part because "[t]here can be no question, of course, that [the litigant] has sufficient interest in challenging the statute's validity to satisfy the 'case or controversy' requirement of Article III of the Constitution."); *Harp Adver. Illinois, Inc. v. Vill. of Chicago Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993) (holding that overbreadth doctrine "does not imply . . . that the requirement of standing to sue has been elided.").

Mt. Lebanon's ordinance only requires solicitors to obtain permits if they intend:

To go from door to door in the Municipality (i) soliciting contributions or pledges for contributions, or (ii) selling or attempting to sell subscriptions, products or services, or taking

10

orders or attempting to take orders for subscriptions, products or services from or to an occupant of a residence.

Ordinance § 303; App. at 38. SEIU has not alleged that it desires or intends to solicit in Mt. Lebanon. Its complaint alleges only that its "volunteers will hand out literature, emphasize the importance of this year's presidential election, encourage the people to vote, and help the voters to determine their proper polling location." Compl. ¶ 11; App. at 30. SEIU is completely unaffected by the permitting requirement applicable to solicitors. Consequently, it cannot establish "injury-in-fact" and lacks constitutional standing to challenge the permitting requirement either under the guise of a facial or an "as applied" challenge. *See Munson*, 467 U.S. at 958; *Harp*, 9 F.3d at 1292.

SEIU argues that we should apply the "relaxed standing principles" used in the First Amendment overbreadth context. But, as noted, those principles are only applicable to prudential standing requirements, not the constitutional requirements of Article III jurisdiction.[2] We are not free to hear a party's facial challenge to a municipal regulation that is wholly inapplicable

---

[2]SEIU's reliance on *Peachlum v. City of York*, 333 F.3d 429 (3d Cir. 2003), is misplaced. In that case, we ruled that facial First Amendment challenges are subject to a "relaxed ripeness standard." *Id.* at 434. We allowed the plaintiff to pursue her claim even though administrative review of the enforcement action taken against her was not yet complete. We specifically noted that she had established "concrete injury." *Id.* at 437 ("[W]here a party suffers a concrete injury prior to final administrative disposition, such as fines or unreasonable appeal fees, the claim may be considered sufficiently ripe."). We by no means relaxed the constitutional requirements for standing.

11

to the party. While the canvassing registration requirement and the solicitation permitting requirements are both found within the ordinance, they clearly establish distinct and independent requirements for their application. Overbreadth doctrine effectively allows a party to challenge separate and hypothetical applications of a regulation only when an otherwise valid application of that same regulation causes the party injury-in-fact. It does not allow a party to challenge a regulation that is wholly inapplicable to the party, regardless of the regulation's location in the statute books. Based on SEIU's complaint, there is no reason to believe that SEIU has or will suffer injury from the solicitation permitting requirement.

III.

Having thus limited the scope of permissible review, we now turn to SEIU's challenge to Mt. Lebanon's registration requirement for those who wish to canvass. In cases raising First Amendment questions, "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984); *United States v. Various Articles of Merch.*, 230 F.3d 649, 652-53 (3d Cir. 2000).

The latest Supreme Court precedent governing the regulation of door to door canvassing is *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150 (2002). Faithfully following the teachings of that precedent leads to the conclusion that Mt. Lebanon's regulation of canvassing does not pass constitutional muster.

Here, as in *Watchtower*, it is unnecessary to resolve the issue of whether the ordinance at issue should be subjected to

"strict scrutiny."[3] This is the case because here, as there, "the breadth of the speech affected by the ordinance and the nature of the regulation make it clear that" the ordinance cannot be sustained. *Id.* at 164. Our task here, as there described by the Supreme Court, is to "look . . . to the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interest that the ordinance purports to serve." *Id.* at 165. "We must 'be astute to examine the effect of the challenged legislation' and must 'weigh the circumstances and . . . appraise the substantiality of the reasons advanced in support of the regulation.'" *Id.* at 163 (quoting *Martin v. City of Struthers*, 319 U.S. 141, 144 (1943) (quoting *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 161 (1939))). We agree with Mt. Lebanon that this balancing test does not require it to show that its canvassing regulation is the least restrictive or least intrusive means of serving its legitimate governmental interests. Nevertheless, to the extent that the ordinance "is not tailored to the [municipality's] stated interest," there is a commensurate reduction in the municipality's interest in its enforcement. *Id.* at 168.

In *Watchtower*, an ordinance of the Village of Stratton, Ohio, prohibited door to door canvassing for "the purpose of

---

[3]"Content based" regulation of speech is normally subjected to "strict scrutiny" when judicially reviewed. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). Mt. Lebanon's singling out of canvassing involving discussion of "issues of public or religious interest" arguably renders that segment of the ordinance "content based." *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (ordinance banning distribution of anonymous campaign literature held to be "direct regulation of the content of speech" and subject to "strict scrutiny").

13

promoting any 'cause' without first" obtaining a permit. *Id.* at 154. Like the Mt. Lebanon ordinance, it contained an unchallenged provision under which residents could prohibit even those canvassing with permits. The *Watchtower* Court began its analysis by assessing the amount and character of the speech covered and the manner in which it was burdened:

> [T]he Village's ordinance prohibits "canvassers" from going on private property for the purpose of explaining or promoting any "cause," unless they receive a permit and the residents visited have not opted for a "no solicitation" sign. . . . The ordinance unquestionably applies, not only to religious causes, but to political activity as well. It would seem to extend to "residents casually soliciting the votes of neighbors," or ringing doorbells to enlist support for employing a more efficient garbage collector.
>
> The mere fact that the ordinance covers so much speech raises constitutional concerns. It is offensive – not only to the values protected by the First Amendment, but to the very notion of a free society – that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so. Even if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant, a law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition.

*Watchtower*, 536 U.S. at 165-66 (footnote omitted).

14

The Court went on to note "three obvious examples [to] illustrate the pernicious effect of" the ordinance. First, the ordinance burdened the "significant number of persons who support causes anonymously" by requiring them to identify themselves in the course of the permit application process. *Id.* at 166-67. Second, the permit requirement imposed an "objective burden" on those whose "religious scruples will prevent them from applying for such a license" and on those "patriotic" citizens whose "firm convictions about their constitutional right to engage in uninhibited debate" would lead them to "prefer silence to speech licensed by a petty official." *Id.* at 167. And third, the ordinance effectively banned "a significant amount of spontaneous speech." *Id.* The Court reasoned that:

> A person who made a decision on a holiday or a weekend to take an active part in a political campaign could not begin to pass out handbills until after he or she obtained the required permit. Even a spontaneous decision to go across the street and urge a neighbor to vote against the mayor could not lawfully be implemented without first obtaining the mayor's permission.

*Id.* at 167.

The scope of Mt. Lebanon's ordinance and the burden it places on free speech are comparable to the scope and "pernicious" effects found in *Watchtower*. Mt. Lebanon's registration requirement extends to the core First Amendment areas of religious and political discourse, and its regulation of written material encompasses all subject matter without

15

limitation. Moreover, its effect on spontaneous speech,[4] anonymous advocacy,[5] and advocacy by those with religious or patriotic scruples is indistinguishable from that of the *Watchtower* ordinance.

While it is true, as Mt. Lebanon stresses, that this

---

[4]Mt. Lebanon points out that its police department is open twenty-four hours a day, seven days a week, and contends that therefore even spontaneous decisions to canvass are accommodated by the ordinance. This does mitigate the burden on spontaneous speech to some extent as compared to the situation in *Watchtower*, but the primary burden Mt. Lebanon's ordinance places on spontaneous speech stems from its requirement that an individual, before walking down the street to discuss a public issue or to hand out fliers, must first travel to the police station, identify himself, and announce his intentions. Here, as in *Watchtower*, "[e]ven a spontaneous decision to go across the street and urge a neighbor to vote against the mayor could not lawfully be implemented without first" taking a trip to advise the authorities. *Watchtower*, 536 U.S. at 167. The interest in protecting spontaneous speech is especially strong for political speech because "timing is of the essence in politics. It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 163 (1969) (Harlan, J., concurring).

[5]While canvassers in Mt. Lebanon are not required to carry a permit or other identifying material with them when they canvass, their anonymity is nonetheless sacrificed. The ordinance specifically requires canvassers to present photo identification, their names, and home addresses at the time of registration. Such a requirement "necessarily results in a surrender of . . . anonymity." *Watchtower*, 536 U.S. at 166.

16

segment of its ordinance requires registration rather than a permit, we do not regard this as a material distinction. Permitting schemes do raise additional constitutional concerns because they present an opportunity for state officials to exercise discretion concerning content or cause delay in the approval process. *See, e.g., Schneider*, 308 U.S. at 163 (striking down ordinance that "permits canvassing only subject to the power of a police officer to determine, as a censor, what literature may be distributed from house to house and who may distribute it"). But, as we have noted, the *Watchtower* Court found its ordinance to constitute "a dramatic departure from our national heritage and constitutional tradition," even "if the issuance of permits by the mayor's office is a ministerial task that is performed promptly and at no cost to the applicant." 536 U.S. at 166.

Having found the burdens here imposed on First Amendment values comparable to those in *Watchtower*, we turn to the other side of the balance we are required to strike and evaluate the degree to which the ordinance is tailored to serve the interests which it purports to serve. Here also we find our case indistinguishable from *Watchtower*.

Mt. Lebanon insists that its ordinance serves two governmental interests: the prevention of fraud and the prevention of crime. Both were advanced in justification of the *Watchtower* ordinance. Like the Supreme Court there, we have no difficulty concluding that "these are important interests that [a municipality] may seek to safeguard." *Id.* at 165. We also conclude in accordance with *Watchtower*, however, that Mt. Lebanon's ordinance "is not tailored to the [municipality's] stated interests." *Id.* at 168.

As the *Watchtower* Court concluded, "[e]ven if the interest in preventing fraud could adequately support [an] ordinance [regulating] commercial transactions and the

17

solicitation of funds, that interest provides no support for its application to [Jehovah's Witnesses], to political campaigns, or to enlisting support for unpopular causes." *Id.* at 168. It necessarily follows that prevention of fraud provides no support for the ordinance here at issue.

With respect to preventing crime, the *Watchtower* Court acknowledged that there are those who use canvassing to facilitate crime. It concluded, however, that the permit scheme did not serve this interest effectively:

> [I]t seems unlikely that the absence of a permit would preclude criminals from knocking on doors and engaging in conversations not covered by the ordinance. They might, for example, ask for directions or permission to use the telephone, or pose as surveyers [sic] or census takers. Or they might register under a false name with impunity because the ordinance contains no provision for verifying an applicant's identity or organizational credentials.

*Id.* at 169 (citation omitted).

Justice Breyer, joined by Justices Souter and Ginsberg, while joining the Court's opinion, wrote "separately to note that the 'crime prevention' justification for [the Stratton] ordinance [was] not a strong one." *Id.* at 169. He went on to observe that it was "intuitively implausible to think that Stratton's ordinance serve[d] any interest in preventing . . . crimes." *Id.* at 170.

Mt. Lebanon insists that its registration requirement for canvassers was intended to help prevent crime in general and

violent crime and burglary in particular.[6]  It argues that the ordinance "prevents and detects violent crime by assuring that a registered canvasser can be identified and by making it a crime not to register." Br. Appellee at 15.  It presented evidence to the District Court of crimes committed by solicitors and canvassers in surrounding communities and across the nation.  But Mt. Lebanon fails to make a critical showing: that requiring registration of individuals who distribute written material door-to-door or who canvass to discuss issues of religious or public interest is likely to have a material impact on the incidents of burglary, violent crime or other crime in the municipality. While it is true, as Mt. Lebanon stresses, that it is not required to show that its ordinance is the most effective or least intrusive means of fighting crime available to it, it does have the burden of showing that the benefit to be gained from its ordinance provides reasonable justification for its considerable burden on First Amendment values.  And as Justice Breyer noted in *Watchtower*, the Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden." 536 U.S. at 170 (quoting *Nixon v. Shrink Missouri Government PAC*, 52 U.S. 377, 392 (2000).

Here, as in *Watchtower*, those intent on burglary or violent crime can easily avoid the registration requirement and accomplish their mission by asking for directions or to use the telephone, and by refraining from distributing written materials. Alternatively, they can frustrate the ordinance's effectiveness by registering under a false name.  More importantly, however, here as in *Watchtower*, we think it "intuitively implausible to think" that those determined to commit such crimes will comply with the registration requirement.  After all, if they are not

---

[6]The District Court concluded, with record support, that a desire to prevent crime was among the motivations of the Mt. Lebanon Council.

deterred by the substantial criminal penalties which exist for burglary and violent crime, it is not reasonable to expect that they will alter their behavior because of a $300 fine for failing to register.[7]

In sum, here as in *Watchtower*, the challenged ordinance is not tailored to serve Mt. Lebanon's legitimate interest in preventing crime and fraud. At the same time, that ordinance substantially burdens a broad range of speech which enjoys the highest level of First Amendment protection. Accordingly, the balance must be struck in SEIU's favor.

IV.

---

[7]The availability of direct punishment for crime has caused the Supreme Court to repeatedly reject government arguments that canvassing regulations are narrowly tailored to serve anti-crime interests. *See McIntyre*, 514 U.S. at 357 ("The State may, and does, punish fraud directly. But it cannot seek to punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented."); *Vill. of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637 (1980) ("The Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly."); *Schneider*, 308 U.S. at 162 (rejecting anti-littering justification for handbill prohibition in part because "[t]here are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets."); *id.* at 164 (conceding that "fraudulent appeals may be made in the name of charity" but noting that "[f]rauds may be denounced as offenses and punished by law.").

We will reverse the judgment of the District Court and remand for further proceedings consistent with this opinion.