**UNITED STATES of America,
Plaintiff,**

v.

**Jake J. BRAHM, Defendant.**

**Criminal Action No. 07–0167 (JLL).**

United States District Court,
D. New Jersey.

Oct. 19, 2007.

Michael A. Hammer, Office of U.S. Attorney, Newark, NJ, for Plaintiff.

Walter Andrew Lesnevich, Lesnevich & Marzano–Lesnevich, Esqs., Hackensack, NJ, for Defendant.

## OPINION

JOSE L. LINARES, District Judge.

This matter comes before the Court on Jake Brahm's ("Defendant" or "Brahm") motion to dismiss the indictment against him and for additional discovery. For the reasons set forth below, Defendant's motion is denied.

### *BACKGROUND*

Brahm, a resident of Wauwatosa, Wisconsin, posted the following message on the website www.4chan.org sometime during September, 2006:

On Sunday, October 22, 2006, there will be seven "dirty" explosive devices detonated in seven different U.S. cities: Miami, New York City, Atlanta, Seattle, Houston, Oakland, and Cleveland. The death toll will approach 100,000 from the initial blast and countless other fatalities will later occur as a result from radio active fallout.

The bombs themselves will be delivered via trucks. These trucks will pull

up to stadiums hosting NFL games in each respective city. All stadiums to be targeted are open air arenas excluding Atlanta's Georgia dome, the only enclosed stadium to be hit. Due to the open air the radiological fallout will destroy those not killed in the initial explosion. The explosions will be near simultaneous with the city specifically chosen in different time zones to allow for multiple attacks at the same time.

The 22nd of October will mark the final day of Ramadan as it will fall in Mecca, Al-Qaeda will automatically be blamed for the attacks later through Al-Jazeera, Osama Bin Laden will issue a video message claiming responsibility for what he dubs "America's Hiroshima". In the aftermath civil wars will erupt across the world both in the Middle East and within the United States. Global economies will screech to a halt and general chaos will rule.

This posting became a news story of some national prominence in the days leading up to October 22, 2006. *See, e.g.,* Mimi Hall, *Skeptical Authorities Pass Along NFL Stadium "Dirty Bomb" Threat, U.S.A. Today,* Oct. 19, 2006, at 3A; *Threat Made to 7 Stadiums; U S Is Skeptical, N.Y. Times,* Oct. 18, 2006, at A16.

A subsequent investigation led to an indictment against Brahm for violation of 18 U.S.C. § 1038(a)(1) and (2), issued on February 28, 2007.[1] Section 1038(a)(1), enacted as the Stop Terrorist and Military Hoaxes Act of 2004, criminalizes

> engag[ing] in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of [numerous predicate criminal acts involving, *inter alia,* nuclear, biological, or chemical weapons, transportation, buildings, and explosives].

18 U.S.C. § 1038(a)(1). Specifically, the indictment alleges that Brahm's posting represents conduct that conveyed information he knew to be false concerning acts that would be violations of 18 U.S.C. § 844(i) (damage to buildings or vehicles), 18 U.S.C. § 2332a(a)(1)(D) (weapons of mass destruction), and 18 U.S.C. § 2332h(a)(1)(A) (radiological dispersion devices, or "dirty bombs").

Defendant moved before this Court to dismiss the indictment on May 8, 2007. The motion made three arguments: first, that § 1038 was either overbroad or vague; second, that the phrase "may reasonably be believed" in § 1038(a)(1) must be construed in light of Brahm's target audience; and finally, that Brahm had not received all of the material he was entitled to under Federal Rule of Criminal Procedure 16(a)(1)(E). The Government opposed all of Defendant's arguments, claiming that § 1038 is neither overbroad nor vague, that the word "reasonably" must be construed according to the traditional reasonable person standard, and that Defendant is not entitled to any more discovery under Rule 16.

As the first two issues raised in Defendant's motion—the challenges to § 1038's constitutionality and proper construction—

---

1. Defendant did not challenge the indictment based on § 1038(a)(2), which criminalizes a false statement made "with intent to convey false or misleading information, about the death, injury, capture, or disappearance of a member of the Armed Forces" during a military conflict. 18 U.S.C. § 1038(a)(2). This portion of the statute does not contain the circumstantial "reasonably believed" language employed in § 1038(a)(1), and therefore the Court notes that the analysis set forth in this Opinion has no bearing on any construction of subsection (a)(2).

appeared to be of first impression, this Court held oral argument on October 1, 2007. At oral argument, Defendant limited his challenge to the constitutionality of § 1038 to the issue of vagueness, and conceded that the statute was not overbroad. (Tr. of Oct. 1, 2007, at 19:12–16.) This Opinion and the accompanying Order followed.

## DISCUSSION

### A. Vagueness

Brahm challenges the constitutionality of § 1038's requirement that information be conveyed "under circumstances where such information may reasonably be believed." (Def.'s Br. at 4–5.) In order to bring his challenge, Brahm must establish that he possesses the standing required under the vagueness doctrine, and then satisfy the substantive requirement that legislation must be so inadequately drafted as to force a person of common intelligence to guess at the conduct it compels or prohibits. *United States v. Tykarsky*, 446 F.3d 458, 472 (3d Cir.2006).

■■■ A defendant may only bring a claim for vagueness against a criminal statute if the defendant's conduct was arguably outside the scope of the statute. *Gibson v. Mayor of Wilmington*, 355 F.3d 215, 225 (3d Cir.2004). An exception to this requirement exists for vagueness challenges in which constitutionally protected conduct is at issue, such as speech. *United States v. Loy*, 237 F.3d 251, 259 (3d Cir.2001).

■■■ Here, Brahm satisfies the strict standing requirements of the vagueness doctrine in challenging § 1038. He argues that the vagueness of the statute violates his rights under the First Amendment.[2] (Def.'s Br. at 6.) Because Brahm challenges the statute based on the theory that his conduct was protected under the Constitution, this relieves him of the obligation to show that his conduct was beyond the scope of § 1038. *Loy*, 237 F.3d at 259. Brahm's vagueness challenge, therefore, proceeds to the merits.

■■■ A federal criminal statute is presumed valid. *United States v. X–Citement Video, Inc.*, 513 U.S. 64, 73, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). The vagueness doctrine recognizes, however, that a statute must provide fair notice of what activity it proscribes in order to meet the requirements of the Due Process clause of the Constitution. *Gibson*, 355 F.3d at 225. If a party challenging a statute can show that the law is so inadequately drafted that ordinary people would have to guess at the conduct it prohibits, the law would be struck down as unconstitutionally vague. *Tykarsky*, 446 F.3d at 472. For a party to bring a facial challenge for vagueness, however, the statute must first be found to be unconstitutionally vague as applied to the conduct in question prior to reaching the facial challenge. *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). If the statute is not vague as applied to the

---

**2.** Although counsel for Defendant used some language denying the character of Brahm's internet posting as speech in relation to the overbreadth argument, the Court notes that counsel also characterized Brahm's posting as a joke. (Tr. of Oct. 1 at 13, 18.) Humor receives First Amendment protection, despite its essentially false nature. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 52–56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (discussing satiri-

cal cartoons); *United States v. Fuller*, 387 F.3d 643, 647 (7th Cir.2002) (discussing humor as protected speech in context of presidential threat statute). This Court, however, does not rule on whether Brahm's posting was protected speech or a mere false statement of pending fact. *See Gibson v. Mayor of Wilmington*, 355 F.3d 215, 227–28 (3d Cir. 2004) (precluding, in general, false statements of fact from inclusion in protected speech).

party in question, then that constitutional application of the law is sufficient to uphold the statute. *Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. 1186.

■ Brahm challenges as vague § 1038's language requiring that a hoax be conveyed "under circumstances where such information may reasonably be believed." 18 U.S.C. § 1038(a)(1). Specifically, Defendant questions whether an individual could receive notice from the statute that communications not directed toward "government security personnel, the news media, or any person of authority" would be offenses against the United States. (Def.'s Br. at 4–5.) In support of this argument, Brahm notes that the "circumstances" where a communication could be reasonably believed are not entirely clear in light of 18 U.S.C. § 1038(c), which provides that a person convicted under subsection (a) is civilly liable for the costs of emergency response resulting from conveying the false or misleading information. (*Id.* at 5.)

■ It is apparent from a close reading of the statute that Brahm's interpretation of § 1038 is strained. When interpreting a statute, courts will give words their plain and ordinary meanings unless there is reason to do otherwise. *Tykarsky,* 446 F.3d at 473. Section 1038 plainly states that "any conduct" that could result in a hoax being "reasonably believed" is the predicate for criminal penalties. The statute does not contain, in the subsection containing the elements of the offense, any reference to governmental authorities or law enforcement. 18 U.S.C. § 1038(a). If Congress had chosen to require an offend-

er to address the government, law enforcement, or the media, it could have chosen to include such language in the statute. Indeed, aware as Congress was of the costs to emergency responders, it did insert references to them in subsection (c) of the statute, as noted by Defendant. 18 U.S.C. § 1038(c). In doing so Congress elected not to tie emergency responders' level of awareness of a hoax, or the subjective belief of any emergency responders about a hoax, to the elements of the Stop Terrorist and Military Hoaxes Act of 2004. 18 U.S.C. § 1038(a), (c).

Furthermore, this Court finds that § 1038 is not vague as applied to Brahm's conduct. Brahm posted his statement to a generally accessible website. Whether this posting was, indeed, made "under circumstances where such information may reasonably be believed" is ultimately a question for the jury, but this phrasing is not impermissibly vague when applied to his conduct. 18 U.S.C. § 1038(a)(1). A person of general intelligence, presented with the language disputed by Brahm, would be aware that criminal liability might attach when making an internet posting about a terrorist attack. *Tykarsky,* 446 F.3d at 473. While the statute could well have been drafted with more precision, by defining or replacing such terms as "circumstances" or "believed," this statute is not deficient in comparison to similar statutes.[3] *Id. See* 18 U.S.C. § 1365(c)(2) (employing very similar language to criminalize false claims of product tampering). The vagueness doctrine seeks to provide fair warning and avoid arbitrary enforcement, and Brahm's act, one that he

---

**3.** Indeed, nearly the same language has appeared in 18 U.S.C. § 1365(c)(2) since 1983. Federal Anti–Tampering Act, 18 U.S.C. § 1365(c)(2) (enacted as P.L. 98–127, Oct. 13, 1983) (criminalizing dissemination of certain false information "under circumstances in which the information may reasonably be expected to be believed"); *United States v. Botello,* 70 F.3d 78, 79 (9th Cir.1995) (affirming conviction under § 1365(c) in absence of vagueness challenge).

concedes he performed, is one that appears to fall within the plain and unambiguous meaning of the statute. *Tykarsky,* 446 F.3d at 473; Def.'s Br. at 2. As desirable as perfect statutes might be, this Court will not enforce a vagueness standard requiring perfect drafting of criminal statutes, and § 1038 is not unconstitutionally vague as applied to Brahm.

As Brahm's challenge to the vagueness of § 1038 does not succeed based upon its application to his circumstances, it is not necessary for this Court to reach the issue of whether his broader allegations of facial vagueness have merit, because a valid application of the statute suffices to uphold it. *Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. 1186.

## B. Overbreadth

Brahm conceded his overbreadth challenge to § 1038 at oral argument. (Tr. of Oct. 1, 2007, at 19:12–16.) Despite this concession, because overbreadth and vagueness are recognized as related, almost intertwining doctrines, and the question of whether § 1038 is unconstitutionally overbroad remains an issue of first impression, this Court will devote some attention to Brahm's argument as made in his brief. *United States v. Tykarsky,* 446 F.3d 458, 472 n. 9 (3d Cir. 2006); *United States v. Loy,* 237 F.3d 251, 259 n. 2 (3d Cir.2001).

 The Supreme Court has explained that "[t]he overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 255, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002); *Tykarsky,* 446 F.3d at 472. A statute may be unconstitutionally overbroad if it directly limits speech itself, or if it regulates expressive conduct. *Broadrick v. Oklahoma,* 413

U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). If a statute chills a substantial amount of protected speech, it will be unconstitutional unless the government can show that the statute is narrowly tailored to protect a compelling state interest. *Ashcroft,* 535 U.S. at 255, 122 S.Ct. 1389; *Broadrick,* 413 U.S. at 611–12, 93 S.Ct. 2908. In bringing an overbreadth challenge, a party is not limited to arguing that its own conduct was protected. *SEIU, Local 3 v. Mt. Lebanon,* 446 F.3d 419, 423 (3d Cir.2006). A party may allege that other conduct, not within the facts of the case, would render the statute facially overbroad and unconstitutional. *Id.*

 *Gibson v. Mayor of Wilmington,* the leading case in this circuit, held that the factors to be considered in an overbreadth analysis are: "the number of valid applications, the historic or likely frequency of conceivably impermissible applications, the nature of the activity or conduct sought to be regulated, and the nature of the state interest underlying the regulation." 355 F.3d at 227. The first two *Gibson* factors are compared against each other, and then analyzed with the last two to determine overbreadth under the substantial prohibition test. *Ashcroft,* 535 U.S. at 255, 122 S.Ct. 1389.

Here, the Court assumes arguendo that Brahm had standing to bring a facial overbreadth claim. Brahm may bring a First Amendment challenge to § 1038 because the Government is prosecuting him under that statute, and may allege facts not within his own case to bring the challenge. *SEIU, Local 3,* 446 F.3d at 423. As a facial claim of overbreadth would naturally be stronger than an as-applied claim, by including statements that occupy the field of protected speech more squarely than Brahm's posting, the Court will examine the facial argument made in Brahm's brief.

### 1. Valid Applications Compared to Impermissible Applications

Here, the statute challenged criminalizes engaging in

> any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute [one of several predicate violations.]

18 U.S.C. § 1038(a)(1). Section 1038 was designed to prevent and punish phony bomb threats and other such hoaxes where no real threat existed, but law enforcement time and effort would be needlessly (and intentionally) sidetracked into looking for nonexistent weapons and fictitious imminent threats. H.R. Rep. 108–505, at 4 (2004). Such speech would be outside of the protection of the First Amendment, similar to shouting fire in a crowded theater or threatening the president. *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919); *United States v. Kosma*, 951 F.2d 549, 556–57 (1991). *See also Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (denying protection to calculated falsehood); *Gibson*, 355 F.3d at 227 (finding false statements to have little protection under the First Amendment). The intended reach of the statute—to "hoax[es] related to biological, chemical, or nuclear dangers"—would capture the presumably numerous fake threats Congress sought to restrain. (Gov't's Br. at 11, quoting H.R. Rep. 108–505, at 7 (2004).)

The counterexample brought forth by Defendant that appears to have the greatest weight is the fictitious news broadcast with great inherent verisimilitude, such as Orson Welles's "War of the Worlds" broadcast. (Def.'s Br. at 5–6); *Mercury Theater on the Air: War of the Worlds* (CBS radio broadcast Oct. 30, 1938). While the example of Martians with ray guns may not qualify as something within the reasonable belief required by the statute, it would represent the kind of intentionally false information anticipated by § 1038. A closer case, such as a fictitious broadcast of a terrorist attack on a major city with the goal of making a kind of political or artistic statement, causes greater concern, as there may be some expressive, protected speech of that type might be affected by § 1038.[4]

*Gibson* noted that in comparing valid restrictions on speech to invalid restrictions, "a sensitivity to reality" must be utilized in examining hypothetical situations, and that probable concerns have more weight than improbable scenarios. 355 F.3d at 226–27. Here, it would appear that hoaxes from attention-seekers or fellow-travelers of dangerous movements would be more frequent than dramatic presentations of realistic false news broadcasts. The expressive speech, analyzed in light of the comparison factor, therefore most likely represents the kind of rare speech that the *Gibson* court allowed to be restricted. *Id.* at 226 (noting that rare, false, marginal speech may be regulated in police policy context).

### 2. Nature of the Conduct Regulated

Examining the nature of the conduct regulated calls for a closer examination of

---

4. Similar fictitious news features have been broadcast on television more recently than "War of the Worlds," in 1983 and 1994, respectively. *Without Warning* (CBS television broadcast Oct. 31, 1994); *Special Bulletin* (NBC television broadcast Mar. 20, 1983). Both of these programs aired with disclaimers, as did the original "War of the Worlds" broadcast in its final moments. *Wikipedia, War of the Worlds (Radio)*, http://en.wikipedia.org/wiki/The—War—of—the—Worlds—(radio) (last visited Sept. 28, 2007).

the kind of speech regulated by § 1038. The statute expressly forbids conduct performed with an "intent to convey false or misleading information." 18 U.S.C. § 1038(a)(1). As previously noted, false statements generally do not enjoy the protection of the First Amendment. *Virginia State Bd. Of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Gibson*, 355 F.3d at 227. The kind of utterances that cause immediate public hazard, the proverbial shouting of fire in a public theater, are also outside free speech protections. *Schenck*, 249 U.S. at 52, 39 S.Ct. 247. Threats to government officials such as the president, outside a political context, are also unprotected. *Kosma*, 951 F.2d at 553. The Supreme Court has found, however, that certain false or misleading speech is protected when it comes within a core value area of free speech. *Cantwell v. Connecticut*, 310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (protecting false statements in religious speech context). The Third Circuit noted this in *Gibson*: "[w]hile it is true that certain types of false statements seem to be protected, they are false statements that ultimately promote an uninhibited marketplace of ideas." 355 F.3d at 227 (internal quotation omitted). The Supreme Court has also long held that the literary value of a work places it within the protection of the First Amendment. *See, e.g., Ashcroft*, 535 U.S. 234, 246, 122 S.Ct. 1389 (2002) (noting that speech with literary value was not within the unprotected category of obscenity).

The expressive speech that § 1038 may chill, such as a "War of the Worlds"-style broadcast, stands in a difficult place in First Amendment jurisprudence. Such a broadcast runs the risk of creating considerable public nuisance and unease as described in *Schenk*, and is the kind of false information, intentionally conveyed, that could easily be within the scope of § 1038 if the broadcast contained a false bomb threat. 18 U.S.C. § 1038(a)(1); 249 U.S. at 52, 39 S.Ct. 247. On the other hand, it would be difficult to exclude the original "War of the Worlds" broadcast, and the sensational reaction to it, from our modern idea of the marketplace of ideas. *See Virginia v. Hicks*, 539 U.S. 113, 119, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (describing the harm overbroad statutes cause to the marketplace of ideas).

The only case this Court is aware of that provides an analysis of somewhat similar speech is *Zieper v. Metzinger*, 392 F. Supp 2d 516 (S.D.N.Y.2005). In *Zieper* a filmmaker posted a video on the internet, titled "Military Takeover of New York City," that appeared to be a training film for use by a military organization intent on disrupting the New Years' Eve celebration in Times Square on December 31, 1999. 392 F. Supp 2d at 518, 520. After the FBI successfully requested the operator of the website to remove the video, the filmmaker and the website operator sued for monetary relief for violations of their First and Fifth Amendment rights. *Id.* at 519. The *Zieper* court found that the "Military Takeover" video was entitled to First Amendment protection by virtue of the fact that it provoked thought and provided the filmmaker's social commentary, and examined the video from the perspective of the Supreme Court's precedent that places erroneous statements within the marketplace of ideas. *Id.* at 524–25, n. 2–3. Despite the surface similarity of the "Military Takeover" video and the Brahm statement, this Court finds the *Zieper* analysis unpersuasive in the *Gibson* overbreadth context. First, the *Zieper* court was not conducting an overbreadth analysis, and being outside of our Circuit, not operating under the emphasis *Gibson* places on the lesser protection to false statements of fact. *Gibson*, 355 F.3d at 227. False statements of cur-

rent or imminent facts are at the heart of the dangers posed by a fictitious news broadcast. Second, the *Zieper* court was not engaged in a hypothetical analysis in a facial vagueness claim. The Supreme Court has cautioned against invalidating statutes based upon hypothetical situations: "we are reluctant, in any event, to invalidate legislation on the basis of its hypothetical application to situations not before the Court." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 584, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (internal quotation omitted).

Given the history surrounding such speech—its relative scarcity, significant early impact, yet relative dearth of additional examples—while it may be difficult to characterize it as insubstantial, this Court would find it difficult to characterize such speech as substantial enough to require invalidation of a federal criminal statute. *Ashcroft*, 535 U.S. at 255, 122 S.Ct. 1389.

### 3. Nature of the State Interest

The government interests protected by § 1038 are preservation of order and protection of emergency services personnel from wasteful and potentially risky responses to nonexistent threats. The hoaxes criminalized by § 1038 waste government and private resources, as the reimbursement provision of the statute implies. 18 U.S.C. § 1038(c). The legislative history of the statute refers to additional concerns, finding that hoaxes aid terrorists, endanger public health, and instill fear into the public. H.R. Rep. 108–505, at 4 (2004). The state interest in these issues is very strong, and essential to a primary responsibility of government—to safeguard the public against violence. *Cf. New York Susquehanna and Western Ry. Corp. v. Jackson*, 500 F.3d 238, 253–54, 2007 WL 2472332 at *12 (3d Cir.2007) (pagination in F.3d forthcoming) (noting terrorism prevention as compelling state interest in railroad regulation context). Even the hypothetical expressive broadcast discussed above, if surprising and accurate enough, would run the risk of causing significant cost and harm. Here, therefore, the state interest is very strong, and likely even to be compelling.

### 4. Analysis of the *Gibson* Factors for Overbreadth

Under *Gibson* it would appear that some amount of protected speech may be subject to criminal penalties under § 1038, but that the protected speech would be much lesser in quantity than the unprotected speech controlled, and not on the whole substantial. 355 F.3d at 226. Additionally, while there could be some hypothetical protected, expressive speech reached by the statute, the government's interest in protecting society against bomb scares and similar hoaxes is highly compelling. Section 1038, therefore, would qualify as the kind of regulation on speech that does not substantially restrict protected expression.

As Defendant conceded this overbreadth argument, and this Court believes that § 1038 does not substantially restrict protected speech under *Gibson*, there is no need to engage in the strict scrutiny analysis mandated by *Ashcroft* if any substantial portion of protected speech had been chilled by § 1038. 535 U.S. at 255, 122 S.Ct. 1389.

### C. Interpretation of "Reasonably" in 18 U.S.C. § 1038(a)(1)

Brahm argues that the term "reasonably" in § 1038 must be interpreted so as to take into account whether the particular audience addressed by false or misleading information would believe it to be true. Brahm's posting, alleging that numerous

football games around the United States would be attacked on a specific date, was made on a website called www.4chan.org. Under Brahm's subjective, audience-sensitive interpretation of the term "reasonably," only if the readers of that particular website would have believed his statement to be true could he be held liable. (Def.'s Br. at 4–5.) The Government contends that the term "reasonably" should be interpreted to permit a conviction if, under the circumstances, a reasonable person would have believed the posting. (Gov't's Br. at 25–28.)

A court must interpret a statute by examining its language, purpose, and legislative history, as appropriate. *United States v. Vitillo,* 490 F.3d 314, 321 (3d Cir.2007). Any ambiguity in a criminal statute must be resolved in favor of the defendant. *Vitillo,* 490 F.3d at 321. Federal courts have routinely construed the term "reasonable" as requiring an objective application. Conspiracy liability, for example, may be predicated on the objective, reasonably foreseeable act of a coconspirator. *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Ramos,* 147 F.3d 281, 286 (3d Cir.1998). The Supreme Court has introduced an objective "reasonable person" standard into a criminal statute, imposing a reasonable person standard in the obscenity context. *Pope v. Illinois,* 481 U.S. 497, 500–01, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (noting application of the standard in tort context). The Third Circuit has imposed a reasonable person requirement in the context of the 18 U.S.C. § 871 presidential threat statute. *United States v. Kosma,* 951 F.2d 549, 556–57 (1991).

The analysis in *Kosma* is particularly persuasive, regarding Brahm's contention that the term "reasonably" should be construed subjectively. In *Kosma,* the Third Circuit interpreted the word "willfully" in the presidential threat statute, 18 U.S.C. § 871. 951 F.2d at 556. The *Kosma* court described the two prevailing views of the meaning of "willfully" as subjective and objective. *Id.* at 556. The subjective interpretation required that the defendant make a threat with specific intent to perform it in order to be culpable. *Id.* The objective standard, described by the court as a "reasonable" standard, required only that the defendant communicate a threat in a context where a reasonable person would recognize as a serious indication of intent. *Id.* at 557. In fact, the language used by the court in *Kosma* to define the "willful" standard for culpability is reminiscent of § 1038

> [the act must occur] in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President ...

*Id.* (emphasis removed). This standard, created for the presidential threat statute, appears to match the language and purpose of § 1038 in its use of the term "reasonably." Both statutes additionally have similar purposes in protecting persons from harm resulting from threatening conduct or speech. 18 U.S.C. §§ 871, 1038.

■ This Court finds that as the Third Circuit preferred an objective standard for a criminal threat statute, and associated the term "reasonable" with an objective, reasonable person standard for the threat statute, that the same reasoning would apply for § 1038. 18 U.S.C. § 871; 18 U.S.C. § 1038; *Kosma,* 951 F.2d at 556–58. In construing the statute in question, therefore, this Court holds that the "reasonably believed" language in § 1038(a)(1)

requires the use of an objective, reasonable person standard in determining whether a false or misleading statement is criminally culpable.

### D. Defendant's Right to Additional Discovery Under Fed.R.Crim.P. 16(a)(1)(E)

 Defendant maintains that he requires access to information concerning the actions of "government officials, or emergency services teams, etc." in order to rebut the government's case concerning the believability of his internet posting. (Def.'s Br. at 9.) This request for information is broadly separable into two categories: witness information concerning persons involved in the response to the internet posting, and any documents created as a result of that response.

The Supreme Court has recognized that criminal defendants possess a Constitutional right to certain information prior to trial under *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* singles out "exculpatory" information for special treatment, requiring that it be turned over to the defense before trial in order to assist in the finding of additional information by the defense and for assistance in trial preparation. 373 U.S. at 87, 83 S.Ct. 1194. In order to provide defendants with some additional material to prepare their cases, Federal Rule of Criminal Procedure 16 permits limited pretrial discovery. Aside from the requirements of *Brady* and Rule 16, criminal defendants have no general right to discovery. *United States v. Casseus,* 282 F.3d 253, 257 (3d Cir.2002).

This Court finds that Defendant is not entitled to any additional discovery of witness information under Rule 16. The caselaw in the Third Circuit denies any general right to discovery of government witness information prior to trial in non-

capital cases. *Casseus,* 282 F.3d at 257 (denying right to "full discovery" for criminal defendants); *United States v. DiPasquale,* 740 F.2d 1282, 1294 (3d Cir.1984); *United States v. Jackson,* 649 F.2d 967, 979 n. 15 (3d Cir.1981); *United States v. Mitchell,* 540 F.2d 1163, 1166 (3d Cir. 1976); *Virgin Islands v. Ventura,* 476 F.2d 780, 782 (3d Cir.1973) (construing the Federal Rules); *United States v. Addonizio,* 451 F.2d 49, 62 (3d Cir.1972).

To the extent that Brahm requests additional "photograph books, papers, documents, data, photographs, tangible objects[,] buildings or places" that are material to his defense or intended for use at trial, this Court also finds that he is not entitled to any additional discovery. Fed.R.Crim.P. 16(a)(1)(E); Def.'s Br. at 9. Any reports or documents created by government investigators or responders related to the internet posting, as requested by Brahm in his brief, are not subject to disclosure as documents in response to an investigation under Rule 16(a)(2).

### CONCLUSION

For the forgoing reasons, this Court denies Defendant's motion to dismiss the indictment and for additional discovery. An appropriate Order accompanies this Opinion.